Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1023 | **DATE** | 2/6/2003 |
| **CASE TITLE** | QST Industries, Inc. vs. Norman Feinberg | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment [23-1] is granted. Pretrial order due date of 2/21/03 is stricken and pretrial conference of 3/14/03 and trial date of 4/7/03 are stricken. Plaintiff is directed to submit to this court a proposed judgment agreed to in form by 2/21/03. Costs are allowed to the plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 07 2003 | |
| | Notified counsel by telephone. | | date docketed | 34 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 2/6/2003 | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice MD mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| QST INDUSTRIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 01 C 1023 |
| ) | Judge Joan H. Lefkow |
| NORMAN FEINBERG, ) | |
| ) | |
| Defendant. ) | |

DOCKETED
FEB 0 7 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff QST Industries, Inc. ("QST") seeks judgment against defendant Norman Feinberg ("Feinberg") for equitable contribution, together with interest and attorney's fees, based on both parties' guaranties of a loan to Crusader SportsWear, Inc. ("Crusader"), a company wholly-owned by Feinberg. Crusader defaulted on the loan and the Mid-City National Bank of Chicago (the "Bank") demanded payment from QST. QST asserts that it paid off the remaining balance of the loan as a co-guarantor and it is undisputed that Feinberg has made no payments to the Bank or QST since the loan defaulted. Before this court is QST's motion for summary judgment on its contribution claim. QST is a Delaware corporation with its principal place of business in Chicago, Illinois. Feinberg is a citizen of New York. The amount in controversy exceeds $75,000. Diversity jurisdiction is properly invoked pursuant to 28 U.S.C. § 1332(a). For the reasons set forth below, the motion is granted.

34

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO THE PLAINTIFF

**A.   The parties**

QST is an apparel company that supplies pocketing, lining, waistbands and other "apparel construction components" to companies in the international garment industry. From 1972 through 1999, one of QST's clients was Mannor Corporation ("Mannor"). Prior to having its assets seized, Mannor manufactured men's trousers. (Feinberg Dep. at 11, 13.) During the

2

relevant time period, Feinberg was the president and a director of Mannor and owned 100 percent of its shares (although he gave 10 percent ownership to his son in the late 1990s). Crusader is a sportswear company. During the relevant time period, Feinberg was the president, treasurer and a director of Crusader and owned 100 percent of its shares.

**B.     Feinberg's and QST's guaranties**

In the late 1980s, Mannor experienced cash flow problems. Around 1989, Feinberg asked Ely Lionheart ("Lionheart"), the president of QST, for a loan to one of Feinberg's wholly-owned companies. QST declined Feinberg's request for the loan but did ask the Bank to extend a loan to Feinberg or to one of his companies. The Bank agreed to make a loan to Crusader if QST was willing to sign an unconditional guaranty. QST agreed to guarantee the loan if Feinberg would also guarantee the loan. The Bank then made a $500,000 one-year loan to Crusader. QST and Feinberg each unconditionally guaranteed the loan. The loan was renewed each year at maturity and Feinberg and QST unconditionally guaranteed each renewal. Feinberg also negotiated the interest rate and Feinberg or Mannor paid the interest each year.

In early 1998, Feinberg asked Lionheart and Jeffrey Carlevato ("Carlevato"), the Controller of QST, to ask the Bank to lend Crusader an additional $100,000. The Bank lent an additional $100,000 to Crusader on February 6, 1998 and Feinberg and QST unconditionally guaranteed that loan. In October 1998, the Bank consolidated the $500,000 and $100,000 loans into a single $600,000 one-year demand note (hereinafter the "Crusader Loan"). Crusader remained the borrower and Feinberg and QST unconditionally guaranteed the full $600,000.

3

C.  **The Bayer Guaranty and Feinberg's Employment with Bayer**

In April or May 1999, Mannor's main lender, Finova Capital, seized Mannor's asserts. Finova then sold the assets to Bayer Clothing Group, Inc. ("Bayer"), a clothing manufacturing company. Shortly thereafter, Feinberg signed an employment agreement with Bayer that made no mention of the Crusader Loan. Sometime after Feinberg entered into the employment agreement with Bayer, Bayer represented to Feinberg that it would guaranty the Crusader Loan if Feinberg could convince the Bank to extend the Crusader Loan on a 36-month amortizing basis with the same interest rate, not to have a demand note at the end of every year, and to accept loan payments directly from Bayer.

*1.  When Bayer executed its guaranty*

When the Crusader Loan matured in October 1999, Feinberg asked the Bank to renew the Crusader Loan and to change it to a 36-month amortizing loan as he had discussed with Bayer. (Pl. L.R. 56.1 ¶ 15.) On October 29, 1999, the Bank renewed the Crusader Loan as a 36-month amortizing loan (with an initial interest rate of 8.5 percent), requiring monthly payments of $18,976.85. (*Id.*) Both QST and Feinberg executed unconditional guaranties dated October 29, 1999.

Bayer also executed a guaranty, which is dated October 29, 1999. QST, however, asserts that Bayer actually signed the guaranty as late as possibly February 2000. (Pl. L.R. 56.1 ¶ 16.) QST relies on Feinberg's deposition testimony, where he testifies that Bayer did not sign its guaranty on October 29, 1999 (Feinberg Dep. at 136) and he knew this because:

> You [presumably, QST's counsel] have some correspondence from the [B]ank
> that they kept calling and asking for it [(the signed guaranty)]. They [(Bayer)]
> kept delaying it. They [(the Bank)] spoke to their controller, Mike, he will get it

4

> to them. There is correspondence that I think you guys have as well, that they [(Bayer)] are getting to it, they are getting to it. But I don't think they signed that note until about February[, 2000.]

(Feinberg Dep. at 141.) Neither QST nor Feinberg, however, provides originals or copies of any of the "correspondence" between the Bank and Bayer referred to in Feinberg's deposition testimony.[1]

2. *The contingent nature of the Bayer Guaranty*

Bayer executed the same guaranty as Feinberg and QST but attached a rider ("Rider A"). Rider A provided that: "Guaranty shall automatically terminate and be of no further force and effect on the earlier of (i) the termination of Norman Feinberg's employment, for cause, with the Guarantor or (ii) October 29, 2002 unless the borrower is in default at that time." (*Id.*)

a. *QST's version of the facts*

QST insists that Bayer and Feinberg negotiated Bayer's guaranty to be conditioned on Feinberg's continued employment with Bayer. As proof, QST attaches a letter from Robert I. Bayer, President of Bayer, to Feinberg, dated May 27, 1999, which states that Bayer intended to "assist with the discharge" of Crusader's obligation to the Bank for the $600,000 Crusader Loan and that

> [a]ny commitment [Bayer] make[s] in this regard will be tied to [Feinberg's] employment with [Bayer] and would end on the earlier of [Feinberg's] termination of such employment by [Feinberg] voluntarily, or by [Bayer] for cause, or 36 months after [Feinberg's] employment begins.
> \* \* \*
> If the loan is not rolled forward for the necessary period [(for 36 months)], we intend to work with you to recast the loan as a joint obligation involving Crusader, you and ourselves, where we would either become co-principal or guarantor of the

---

[1] QST provides as additional proof of when Bayer signed the guaranty that Feinberg testified he did not receive any copies of the Bayer Guaranty until February, 2000. (Feinberg Dep. at 142.)

5

obligation. . . . In addition, our guarantee or other obligation to the [B]ank would be conditioned on your continued employment, as indicated above.

(Pl. Ex. 10, hereinafter referred ti as the "Employment Letter"; Pl. L.R. 56.1 ¶ 14.)

b.   *Feinberg's version of the facts*

Feinberg insists that Bayer's guaranty was never conditioned on his continued employment with Bayer. (Feinberg Dep. at 173; Def. Resp. to Pl. L.R. 56.1 ¶ 14.) Although Feinberg acknowledges that he received the Employment Letter from Bayer and that the Employment Letter discussed Bayer's guaranty (and/or promises to make the loan payments) contingent on his continued employment, he testifies that it was a "negotiable point," pointing out that the contingency was not in his original employment contract with Bayer. (Feinberg Dep. at 172-73.) (As indicated, however, the employment agreement said nothing at all of Bayer's guaranty.) As further proof, Feinberg provides a letter, dated October 25, 1999, that the Bank sent him, which attached the draft guaranty agreements for Feinberg, QST and Bayer. (Def. Ex. 4, hereinafter referred to as the "Bank Letter.") The draft of Bayer's guaranty contained no Rider A. (*Id.*) But, the Bank Letter states that Feinberg should discuss the "necessary charges required to be made pursuant to Bayer's employment contract with you." (*Id.*)

Feinberg testified that he signed and returned his guaranty based on his mistaken belief that both Bayer and QST signed and returned identical unconditional guaranties. (Feinberg Aff. ¶ 9; Feinberg Dep. at 138-39, 142, 180.) Feinberg also testified that he did not learn of the contingent nature of the Bayer Guaranty until after January 29, 2000. (Feinberg Aff. ¶ 1; Feinberg Dep. at 132; Def. Ex. 10.) Feinberg has no evidence other than his subjective belief, however, that suggests that Bayer's position was negotiable or that Bayer ever led Feinberg to so

6

believe. Indeed, as Feinberg testified, he "didn't have [Bayer] by the handles" at the time (Feinberg Dep. at 177) and after he received the Employment Letter, he called Bayer and was told "that's it." (*Id.* at 179.) And there is no evidence that the parties reached any agreement at that or any other time that would suggest Bayer's conditional guaranty breached an agreement with Feinberg.[2]

## D. The default of the Crusader Loan

From November 1999 until May 2000, Bayer made monthly payments on the Crusader Loan, paying down approximately $90,000. In May and June, 2000, however, Bayer did not make the payments. On July 3, 2000, the Bank, by and through its retained counsel, sent a letter to Crusader, Feinberg and QST, copied to Bayer, informing the parties that the Crusader Loan was in default and demanding the May and June, 2000 payments along with late charges and attorneys' fees within 10 days of the letter or else it would accelerate "the entire indebtedness[.]" (Pl. Reply Ex. 1.)

---

[2]Further, according to QST, when Brian Griffin ("Griffin"), a senior vice president and senior credit officer with the Bank, later sent the Bank's standard loan and guaranty documents to Feinberg for dissemination to all parties, he did so with the understanding that changes would be made to Bayer's guaranty. (Def. Ex. 4.) The Bank letter was also copied to QST. (*Id.*) Griffin also stated that when QST learned that Bayer would be guaranteeing the Crusader Loan, QST asked to be released from its guaranty. (Griffin Dep. at 24-26, 71.) Griffin explained that he denied QST's request because Bayer's guaranty would be contingent on Feinberg's continued employment with Bayer. (Griffin Dep. at 70.)

Feinberg also asserts that QST was unaware of any conditions in Bayer's guaranty prior to December 10, 1999 (when Bayer sent QST a copy of Feinberg's employment agreement). (Def. L.R. 56.1 ¶ 7, citing Carlevato Dep. at 40-46, 52). QST, however, disputes the fact that the contingent nature of the Bayer Guaranty was unknown to both Feinberg and QST, asserting that it was an "evident issue," "well-known by all of the parties," including Feinberg, "at the time of the original documents being signed." (Pl. Resp. to Def. L.R. 56.1 ¶ 7, citing Griffin Dep. at 67-71.) QST points to Feinberg's testimony that he told Griffin about Bayer's involvement and the requested changes to the Crusader Loan (Feinberg Dep. at 139) and that the Bank's Loan Committee Worksheet, which predates the October 29, 1999 note, reflects the contingent nature of Bayer's guaranty. (Pl. Reply Ex. 3.)

7

In addition to the letter described above, the Bank wrote a letter to both Crusader and QST explaining that it was making a demand on Crusader and that:

> Pursuant to the terms of your Commercial Guarantee demand is made upon you for payment of the delinquency within ten days of this letter. If payment is not received the entire balance will be due as described in the attached letter [(the referenced letter above)] to the borrower and we have been authorized to pursue our remedies as described in your Commercial Guarantee.

(Pl. Reply Ex. 1.) According to Brian Griffin, a senior vice president and senior credit officer with the Bank, this letter was the Bank's demand on QST as a co-guarantor for the payment of the Crusader Loan. (Griffin Dep. at 48-50.)

Because the Bank did not receive the May and June 2000 payments on July 31, 2000, QST paid the sum of $37,812.54 (equivalent to the May-June payments) in partial satisfaction of the Crusader Loan. According to QST, it paid this amount by increasing its own borrowing line with the Bank by the same amount. (Pl. Reply Ex. 5; Pl. Ans. to First Set of Interrogatories ¶¶ 5-6.) Further, QST paid the remaining balance of the Crusader Loan, amounting to $472,003.38, on August 31, 2000.[3] According to QST, it paid off this amount by transferring funds from QST's Cash/Flexible Benefits account at the Bank. (Pl. Reply Ex. 5; Pl. Ans. to First Set of Interrogatories ¶¶ 5-6.)

Feinberg, however, contends that QST paid the Bank not as a co-guarantor but as a purchaser of the Crusader Loan and all loan documents including the guaranties. (Def. Resp. to Pl. L.R. 56.1 ¶ 19.) Feinberg asserts that QST merely transferred the debt to another QST line of

---

[3]Feinberg asserts that QST has no documentary evidence of a demand and that the evidence indicates that QST was not compelled to pay off the Crusader Loan to the Bank but that QST negotiated with the Bank in an attempt to compel Feinberg to pay 100% of the Crusader Loan. The evidence, however, consists of the letters, dated July 3, 2000, from the Bank to QST, and the affidavit of Carlevato and the deposition testimony of Griffin, both of whom Feinberg does not dispute have personal knowledge of the Crusader Loan. (Pl. L.R. 56.1 ¶ 19; Pl. Reply Ex. 1.)

8

credit in exchange for an assignment of loan documents, pointing to a document entitled "January 17, 2001 Assignment and Sale of Loan Instruments" in which QST acquired the guaranties from the Bank and to a copy of a QST September 1, 2000 Bank statement with a handwritten note that states "the note has now been assigned to us for recourse against Feinberg[.]" (Def. Ex. 7.)[4]

In February 2001, Bayer reimbursed QST for the July 31, 2000 payment to the Bank because Feinberg was still employed with Bayer during May and June, 2000. Bayer made it clear to QST that it would not reimburse QST for any additional payments because it had terminated Feinberg's employment for cause. (Pl. L.R. 56.1 ¶ 22.) Indeed, on June 15, 2000, Feinberg's employment with Bayer terminated. (QST, however, concedes that it is a disputed fact between Bayer and Feinberg whether the termination was for cause. (Pl. Reply at 11.)) According to Feinberg, QST and Bayer colluded with each other so that Feinberg would be held accountable for Bayer's share of its guaranty. As proof, Feinberg points to a memorandum, dated December 10, 1999 (the "December Memorandum"), where Bayer provided excerpts of its employment agreement with Feinberg to QST and informed QST of the condition in Bayer's guaranty. (Def. L.R. 56.1 ¶ 4.) In the December Memorandum, Bayer instructed QST to keep the information "confidential." (Def. L.R. 56.1 ¶ 4.)[5] Based on this communication between Bayer and

---

[4]Further, according to Feinberg, Griffin acknowledged that QST's payment to the Bank was in QST's capacity as an assignee and not as a guarantor and that such transaction was "unusual." (Griffin Dep. at 58-59.) The evidence shows, however, that Griffin testified that it was an "unusual situation" for the Bank *to seek payment from guarantors* or "unrelated guarantors" such as QST and that when "QST paid off the loan of Crusader Sports Wear [*sic*] . . . [the Bank] assigned [its] right to the note against the borrower to QST in consideration of [its] payment on the note." (Griffin Dep. at 58-59, emphasis added.) Thus, the court cannot infer from this evidence that this was merely a purchase transaction.

[5]QST objects to the admission of this evidence pursuant to the Rule 611(a) because Bayer's statement to QST to keep the information "confidential" is ambiguous. Fed R. Evid. 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the

Feinberg, Feinberg attempts to imply that QST had an obligation to inform him of Bayer's conditional guaranty but failed to do so. (Def. L.R. 56.1 ¶¶ 5-6.)

On or about February 14, 2001, QST filed the instant action, seeking one-half or, in the alternative, one-third contribution with 5 percent annual interest from Feinberg.

## DISCUSSION

> Under Illinois law, a guaranty is the promise of a third party to pay the obligation of the party primarily liable, if the party primarily liable fails to do so. . . . When a guaranty is embodied in a written contract, . . . the ordinary rules of contract construction apply. . . . When a court takes it upon itself to interpret an unambiguous written contract, the court's interpretation is a declaration of law
> . . . .

*Bandag, Inc. v. Nat'l Acceptance Co. of Am.*, 855 F.2d 491, 494 (7th Cir. 1988) (internal citations and quotations omitted). The parties do not dispute that the language of the guaranties is unambiguous.

QST seeks equitable contribution from Feinberg as a co-guarantor for its repayment of the Crusader Loan to the Bank. Equitable contribution provides:

> If any one or more of a number of co-guarantors of a debt is required to pay the whole or any portion of the debt, the co-guarantors become liable to contribute their proportionate share of the amount paid. A court presumes that all co-guarantors should contribute equally to the discharge of any liability occurring by reason of the guaranty. Co-guarantors that are insolvent are excluded in determining the proportions. This liability to contribute arises not from any contract, but from equitable principles. The presumption that all guarantors

---

interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."). QST responds that it received the December Memorandum and was asked not to share the information with employees from QST's New York office because that office handles an account with Bayer. (Pl. Resp. to Def. L.R. 56.1 ¶ 4.) Although it is not clear how Rule 611(a) provides a basis for QST's objection that the evidence is ambiguous, nevertheless, both parties show that the evidence is not ambiguous because QST kept the December Memorandum confidential not only within QST's office but also from Feinberg. It is not apparent, however, what difference this would make in light of Feinberg's knowledge that Bayer had taken the position that its guaranty had to be conditional well before October 29, 1999, and the lack of any evidence that Feinberg sought the information and was unable to obtain it.

should contribute a proportionate share of the amount paid may be rebutted by parol evidence.

*Harris* v. *Handmacher*, 185 Ill. App. 3d 1023, 1026-27, 542 N.E. 2d 77, 80 (1st Dist. 1989).

Neither party disputes that QST and Feinberg were co-guarantors. Both parties, however, rely on parol evidence to argue whether Feinberg may be discharged from his guaranty and, if not, what is Feinberg's proportionate share of contribution. *See O'Brien* v. *Cacciatore*, 227 Ill. App. 3d 836, 845, 591 N.E. 2d 1384, 1390 (1992) ("Under the parol evidence rule, evidence of prior oral agreements must be excluded if it is offered to vary, alter or contradict a written agreement which is complete, unambiguous, valid and unaffected by fraud, duress, mistake or illegality. . . . An exception to the parol evidence rule provides that extrinsic evidence of the parties' intentions may be introduced to prove mutual mistake, conditional delivery, a lack of consideration or fraud.").

**A. Whether Feinberg may be discharged from his guaranty because QST merely received an assignment of the Crusader Loan and did not pay in its capacity as guarantor**

Feinberg first argues that QST is not entitled to equitable contribution from him because QST cannot prove that it paid the Crusader Loan as a guarantor. Feinberg argues that had QST paid in its capacity as guarantor (in July and August, 2000) that would have extinguished the loan obligation and there would have been no occasion for the Bank to assign the loan documents and guaranties to QST. Feinberg contends that QST did not pay off the Crusader Loan obligation but "merely reallocated [the loan obligation] to another of QST's credit line[s,]" in exchange an assignment of the Crusader Loan (from the Bank to QST) for recourse against Feinberg alone, rather than Feinberg and Bayer. (Def. Resp. at 1, 4.) Although Feinberg argues that this is

11

collusive and "corrosive of [QST's] credibility," he does not explain or provide authority for why this should release Feinberg from any unconditional obligation on his guaranty or to make contribution therefor. *See 330 W. Hubbard Rest. Corp. v. United States*, 203 F.3d 990, 997 (7th Cir. 2000) ("A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for it is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel . . . . In order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority; a perfunctory and undeveloped assertion is inadequate to raise a separate basis for appeal.") (internal citations and quotations omitted). In any event, even if the defaulted Crusader Loan belongs to QST pursuant to an assignment,[6] Feinberg has not shown why QST could not make a demand against guarantors for their proportionate shares.

---

[6] Regarding Feinberg's argument that QST received an assignment, the court infers from this argument that Feinberg asserts that his guaranty was not assignable.

> Illinois recognizes the general rule of nonassignability of guaranties. . . . However, the Illinois courts have refused to apply the rule mechanically; rather they examine the factual setting of each case to determine whether the policy underlying the rule is applicable. The result is that the guarantor is not discharged unless the essentials of the original contract have been changed and the performance required of the principal is materially different from that first contemplated. . . .

*See Essex Int'l, Inc. v. Clamage*, 440 F.2d 547, 550 (7th Cir. 1971) (holding that the purchase of the creditor-guarantee's assets to another corporation did not alter or discharge the guarantor from his obligation) (internal citations and quotations omitted). Here, Feinberg has not shown that the essentials of the original contract have changed and that the performance of the principal (Crusader) is materially different than from that first contemplated. As such, even if QST pursued its claim against Feinberg based on its assignment, *Essex Int'l, Inc.* means that Feinberg would still be liable as a co-guarantor.

B.  **Whether equity requires that Feinberg be discharged from the guaranty because QST and Bayer have colluded against him by QST seeking contribution only from him and not Bayer**

Feinberg next argues that there is a lack of equity because Bayer took the position that it would not pay on its guaranty because it terminated Feinberg for cause; thus, fulfilling the condition of its guaranty. He believes the effort to keep the December Memorandum from Bayer to QST confidential shows an attempt to deceive him. He contends that he as well as QST signed their guaranties on the expectation that Bayer's guaranty was unconditional. Further, he believes that Bayer fired him not for cause but to avoid having to pay on its guaranty. He believes QST should not have accepted Bayer's position that it terminated him for cause but demanded contribution from Bayer as well. Thus, he believes Bayer and QST have colluded against him.

As indicated above, the evidence according to Feinberg shows that Feinberg knew that the Bayer Guaranty was conditional. Even if Feinberg merely knew that there was a risk that Bayer's guaranty would be conditional, Feinberg has not shown how that means that QST has unclean hands simply because it learned of the condition before Bayer stopped paying on the Crusader Loan. Thus, although Feinberg's facts are sufficient for this court to infer that QST and Bayer may have some type of understanding or agreement regarding the proportionate share of contribution that QST seeks from Feinberg, Feinberg's facts do not demonstrate that equity requires that Feinberg should be discharged from his guaranty.[7]

---

[7]Feinberg also argues that he no longer derives a "benefit" from the Crusader Loan because he no longer has an interest in the loan proceeds. This fact is immaterial. The court is only concerned with Feinberg's obligation as a co-guarantor.

13

### C. Whether Feinberg is liable for one-half or one-third of the Crusader Loan obligation

QST seeks one-half, or in the alternative one-third, of the amount it paid. With respect to QST's seeking one-half of the loan repayment, QST, relying on Feinberg's deposition testimony that Bayer's guaranty was not signed contemporaneously with the loan documents, argues that Feinberg has admitted that Bayer's guaranty fails for lack of consideration.

"A guaranty which is executed contemporaneously with the debt it guarantees is supported by sufficient consideration. . . . However, where the guaranty is executed *after* the guaranteed debt is incurred, new consideration is necessary to support the guaranty." *City Nat'l Bank of Hoopeston v. Russell*, 246 Ill. App. 3d 302, 307, 615 N.E. 2d 1308, 1311 (4th Dist. 1993) (internal citations omitted) (emphasis in original). "Consideration has been defined as ' . . . some right, interest, profit or benefit accruing to one party or some forbearance, disadvantage, detriment, loss or responsibility given, suffered, or undertaken by the other." *Finn v. Heritage Bank & Trust Co.*, 178 Ill. App. 3d 609, 611-12, 533 N.E. 2d 539, 541 (3d Dist. 1989), quoting *Artoe v. Cap*, 140 Ill. App. 3d 980, 489 N.E. 2d 420 (1st Dist. 1986).

Parol evidence is admissible to demonstrate lack of consideration. *See O'Brien*, 227 Ill. App. 3d at 845, 591 N.E. 2d at 1390. As evidence, QST points out that even though Bayer purportedly signed its guaranty on October 29, 1999, Feinberg testified that Bayer did not sign its guaranty at that time. QST contends that, subsequent to October 29, 1999, the Bank gave neither Bayer nor Crusader, the borrower, any additional consideration and, therefore, the Bayer Guaranty fails for lack of consideration.

14

QST's argument that Feinberg's statement is a judicial admission is not persuasive because the statement lacks necessary indicia.[8] Nevertheless, because there are no disputes of material fact that Bayer's guaranty was conditional; that on the date the Crusader Loan was called Feinberg had been discharged from employment; that Feinberg has no evidence other than his individual assertion that he was not fired for cause, resulting again in an uncontroverted fact that the condition was fulfilled; and that, on the evidence before the court, Bayer was released from its guaranty. QST made a determination that Bayer was liable for only the May and June, 2000 payments and Bayer has paid QST for those months. Although Feinberg might have impleaded Bayer under Federal Rule of Civil Procedure 14[9] to obtain contribution from Bayer, or at the least produced evidence that the condition was not fulfilled so as to demonstrate an issue of fact as to whether Bayer's guaranty was released, he has not done so.

Accordingly, the court concludes that QST has established a right of contribution from Feinberg for one-half of the amount due the Bank on the Crusader Loan.

---

[8]Such evidence would most likely be insufficient under Illinois law. In *Williams Nationalease, Ltd.* v. *Motter*, the court found that the plaintiff's attestion that she signed an application for credit "as a guarantor" was not a judicial admission that she was a guarantor, stating:

> A judicial admission is a statement made during a judicial proceeding or contained in a document filed with the court. . . . Judicial admissions are binding upon a party and may not be contradicted, whereas an evidentiary admission may be controverted or explained. . . For a statement to constitute a judicial admission, *it must be clear, unequivocal, and uniquely within the party's personal knowledge.* The statement must also be an intentional statement which relates to concrete facts and not an inference or unclear summary.

271 Ill. App. 3d 594, ___, 648 N.E. 2d 614, 617 (4th Dist. 1995) (emphasis added).

[9]Federal Rule of Civil Procedure 14 provides in relevant part:

> **(a) When Defendant May Bring in Third Party.** At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff. . . ."

## ORDER

For the reasons set forth above, QST's motion for summary judgment is granted [#23]. The court strikes the pre-trial order due date of February 21, 2003 and trial date of April 7, 2003. QST is directed to submit to this court a proposed judgment agreed to in form by February 21, 2003. Costs are allowed to the plaintiff.

ENTER:

_____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: February 6, 2003